Services at that hour. Oral argument not to exceed 15 minutes per side. I'm Yvonne Harris for the call. Good morning. Good morning. May it please the court, my name is Yvonne Harris and I represent Mr. Anthony Rachells and his racial discrimination appeal against Cingular Wireless. And you're reserving five minutes rebuttal? Yes. I have here on my sheet. Okay, that's fine. When Mr. Rachells was terminated from Cingular in 2005 as a result of the reduction in force when Cingular bought out and merged with AT&T, he was the highest producing indirect account executive in Northeast Ohio and one of the highest producing indirect account executives in the entire company. Ms. Harris. Yes, sir. There were some comparables. When they did the rift, there were, I think, four other individuals who were from Cingular who retained their job. Yes, sir. Three of them were white males, one was a white female. Am I correct about that? Yes, sir. Two of them were white males, one was a white female. And one was Hispanic. No. Are you saying from Cingular? From Cingular, yes. From Cingular. No. Respectfully, two of them were white males. Okay. One of them was a white female. Okay. And my client is African American. Yeah, but your client didn't get the job. No, sir. He wasn't retained. That's my point. Two white males were retained from Cingular and one white female. Yes. And then there was a Hispanic male from AT&T who was also retained. So my numbers were just off by one. What I wanted to know was how did Mr. Rochelle's attainment percentages compare to the attainment percentages of the two white males and the one white female from Cingular who did keep their job? He blew them out of the water, Your Honor. Is that a part of the record in this case? Yes, Your Honor. It is? Yes, Your Honor. He blew them out of the water and that's the problem with this case. Mr. Rochelle's had the most seniority than the three white co-workers. He had never been disciplined ever. He won a ton of local and national awards for Cingular, including the highest awards. And he had an excellent reputation among his peers and agents. And his employee performance review for the prior year, 2003, was higher than his three white co-workers. Anthony Rochelle was in a sales position in a multi-billion dollar corporation. Sales. When one is a high producer in this type of industry, as he was, people are typically not terminated from these companies absent some other extraordinary circumstances. And Anthony Rochelle's case, that something was racial discrimination. He was told by Dale Zerner that Dave Fine, Dave Fine was the big boss, had it out for him. Dave Fine let go of every single African-American manager of Rochelle's in viewing the summary judgment motion. Well, I would like the court to view that. It's my client's statement. It has not been refuted by... But it's not your client's statement. Someone told him that he, I forgot the man's name, believed that Fines had it out for Rochelle's. I don't know where the Fines told him that he had it out for Rochelle's, or how did he find out? Because Dale Zerner, who was his boss at the time, that's the individual who told him. And he told him, look, this guy Dave Fine has it out for you. And he had told him that about a year prior to his being let go. Mr. Rochelle's wasn't really worried about it. He was on his game. He was sharp. He knew he did his job, so he wasn't that worried about it at the time. And who knew that AT&T and Singler would have then merged and there would have been a necessary downsizing. Ms. Harris, there were a number of complaints, a number of errors rather, that you alleged in the record. One concern that your client had was that the court relied heavily on the statement of facts from the company and that it gave them, I think in your mind, sort of a laser for me right now. And tell me what is the genuine issue of fact that you allege the court missed? Because I understand that at the time the court reviewed this, they had a document from, or evidence from Singler that was fairly straightforward. There ultimately was a response to that, which was in a different posture. But what is the genuine issue of fact that ought to get this case before a jury? There were several, Your Honor. To begin, the court did not take into consideration my client's affidavits and the affidavits of two of his witnesses, one being Mirabel Jones and one being Michael Johnson. And I might have their last name mixed up and I is because she was Hispanic. And because she was Hispanic and a Puerto Rican, and because she was Hispanic and they hired a Hispanic from AT&T, the court reasoned that, well, they find couldn't have discriminated against Ms. Mirabel Jones because an individual from AT&T was hired. And that's not, that just blew my mind. In terms of race and nationality, a Puerto Rican can be black, a Puerto Rican can be white, and Hispanic can be white from the court also opined that all or a portion of the affidavits constituted hearsay? Yes, yes. And not only that, they said they were conclusory, they were hearsay, and that's just not true. I've briefed many cases and the cases state that the, when there is an issue of credibility, that the court does not have the authority to weigh the credibility. And what they did was they just threw them out. They said, oh, Michael Jones or Michael Johnson and Mirabel Jones, they could not have been telling the truth. And that is not the purview of the district court. That is the purview of the jury. And summary judgment should not have been granted because they did not have the authority to weigh that evidence. When there is conflicting facts, as it was in this particular situation. There was also a discovery issue in this situation regarding the discovery cutoff. Ray Schell's, we were not permitted to complete our discovery. There was no trial date set. Ray Schell's had never previously asked for an extension of the discovery time. Singular had already been served with an order setting forth a deadline. Was Ray Schell's request made timely within those deadlines established by the court? No. It was not made within those deadlines set by the court, but there again is case law, which show time after time, courts allowing. But it's discretionary, isn't it? Yes, it is. It is discretionary, but it is not. You argue that the court abused its discretion in this case? Yes, Your Honor. I argue it's abuse. And the reason that I am so adamant that it was abuse is because when I read the case law, most of the case, the majority of the cases, a trial date had already been set. In this situation, no trial date had already been set. The discovery was already sent. And the court, and I don't mean this to sound disrespectful, but this court obviously was in no hurry to get this case off their docket because they took almost two years to rule on the summary judgment motion. I personally have never seen that. In addition, they took almost, no, they took 13 months to rule on the motion to dismiss. So my client is waiting almost two years for summary judgment in a case that is not complex civil litigation. So the court was in no hurry to dispense with it. Ms. Harris, what took so long for Mr. Reshells to begin his discovery? Because the case management plan said that the sponsored motion deadline for March 1, 2010, and Reshells served singular counsel with written discovery request for the first time under cover of letter dated January 28, 2010, just, you know, about a month before the sponsored motion deadline. What was happening in the interim? Complete attorney era and marking the calendar, that's exactly what it was, calendaring, a calendaring issue. Okay. Well, your initial time has expired, Ms. Harris. You'll have five minutes rebuttal time. Thank you. Good morning, Your Honors. My name is Casey Coyle. I represent the appellees, Singular Wireless Employee Service, LLC, and New Singular Wireless Service, Inc. Your Honors, this case concerns allegations of racial discrimination in the context of reduction in workforce, where the former employee appellant failed to deduce any relevant admissible evidence that showed or even tended to show that his former employer singled him out on account of his race and failed to deduce any relevant admissible evidence that would contradict the legitimate non-discriminatory reason behind the elimination of his position. Mr. Coyle, we have an employee who had achieved over 200% of his attainment goals for three successive years, 2002, 2003, 2004. My first question to you is, did those numbers compare favorably or unfavorably to the three white employees whom Singular retained in the RIP? It's a great question, Your Honor. We simply don't know. Appellant failed to deduce any evidence on that. Okay, but you would know that internally because you are the master of your domain. You know what your client has or has not. So do you know? My understanding is there's no contention that he would have had the highest attained percentage of Singular peers. And then he was given a test that, wouldn't you agree, was subjective, the test that was administered to all of the candidates. I believe there were nine candidates. There was a test administered to them that was graded on a scale of one to five, and he received a two. Is that correct? There was three separate, there was a RIF interview process, Your Honor, speaking to, three separate areas of competency were rated. Each was rated from scores from one to five. Yes. Appellants scored respectively two in two of the categories and three in the third. Right. Combining that with his 2004 performance evaluation, which was the second component of the RIF process, he received a total score of 9.6. He, by your admission, had the best attainment numbers of any of the singular candidates who were vying for the position, yet he was the only singular candidate who did not survive the RIF of those nine candidates. Is that right? That's correct. He was also the only African-American. Is that right? That's correct. The point, though, Your Honor, if I may, is simply you touched on two issues. One, which we'll discuss some further later, is who were his comparators? Judge McCarthy did a great job talking in his report and recommendation that appellants tried to frame it as this court solely has to look at these four singular peers. We submit that's not the case. You have to look at all nine. All nine are the comparators. And secondly, you're touching on his attained percentage relative to his singular peers. And as Judge McCarthy noted, appellant failed to deduce any evidence during discovery that would have shown— It concerns me, though. You know, you remember in Alice it said, if the Cheshire Cat said that if you don't know where you're going, it doesn't matter which road you take. So I want to put you on the right road so that at least you can respond to my questions. The objective criteria points to Mr. Racheles as being one of the best persons for the position at singular. The subjective criteria, however, puts him at the bottom. I want to know how to reconcile that as a practical matter because if a company is going to discriminate, they usually don't signal it. What my experience has been 16 years on the district court is that they engage in all levels of sophistry to hide discrimination. And I would think that it would be the same here if singular, in fact, was discriminating. But certain things just jump out at me, and I can't ignore them. And one of my suspicions is always aroused when the minority candidate does poorly subjectively but objectively outdistances his majority peers. You're going to have to explain that to me. Sure. The Sixth Circuit's been clear that subjective criteria may be a basis in a RIF process. Absent proof of racial animus, it doesn't rise to the level of discrimination. Yeah, but they weren't comparing it to objective criteria where the minority candidate far outdistanced the majority candidate. So that's the problem here. If you just had the subjective test and not the attainment data, we would have your argument would be a cogent one. Otherwise, it's on persuasion. Can I just add to the mix as you're answering that question? I recall in the record there was some indication that Mr. Hart, I think he was doing the initial assessment of who should be retained and who should not, indicated that Mr. Fine, the decision maker, may have had it in for Mr. Rochelle's. And then they're scattered throughout the record, and maybe we would argue about what's admissible and not admissible, is that Mr. Fine seemed to, there are those who felt he was guilty of racial animus. Is that a fair statement? Appellant's raised the allegation, yes. And there were stray remarks that are referenced by appellant to that effect. Again, the Sixth Circuit's been clear that stray remarks by a decisional maker, which are not tied to the decisional process, do not rise to the level of proving a prometheation case. Well, the cases are, there are a lot of cases on this. Some talk about like an isolated comment or a few isolated comments. But here there may be sufficient number of comments, arguably, to be more than just that isolated one stray remark. This is purportedly by the decision maker, these remarks. So just a question. I wouldn't dispute that the allegation's been raised. I would say that the underwriting problem of this case is there simply a failure of a record. I just wanted to ask that question, if I could finish. I just wanted to ask that question as you were responding to Judge Marbley's question, because the allegations as to Mr. Fine had not yet really been discussed here. So I don't know if Judge Marbley's question is still outstanding. Perhaps I'm being repetitive, but as to the potential objective criteria that judges do reference, again, we come back to there's just an absence of the record. So we're talking, if we're talking about all nine indirect account executives, and we had evidence to show that, in fact, appellants' attainment percentage, which, again, was not referenced at all for the RIF process, was the highest among them all, perhaps you can perhaps make an inference of a prima facie case or discrimination. There was no development of the record here that's been developed and pointed out by Judge McArthur in his point of recommendation. There's simply no basis from which to draw that comparison. Counsel, you argue that the district court did use and did draw inferences from the facts and drew those in the light most favorable to the plaintiff. Can you explain the basis for that statement and also point out which inferences the court took into account that the court construed in the light most favorable to the plaintiff? And then I want you to address counsel's argument that the court, at the summary judgment level, impermissibly weighed the evidence, which is notówhen, in fact, the court's function there was simply to determine whether there was a genuine issue of material fact. It's axiomatic, Your Honor, that the extent that a properlyówhen a moving party brings forward a properly supported fact or record, that unless it's the fair to respond or deny that properly supported fact, by actual admissible evidence results in that fact being interpreted in favor of the moving party, and that's what occurred. I would submit that when reading the recommendation, however, it's clear that Magistrate Judge McGarth made every attempt to instru every inference in favor of appellant. For example, even accepting the argument that somehow the four singular peers were the sole comparators, which in the context of a rift, any time there's a merger, that makes no sense. I mean, that's far-reaching consequences. They have to be similarly situated, if not for anything else. They were considered for the same position. But even taking that at face value, which was an allegation raised by appellant, Magistrate Judge McGarth pointed out that they failed to establish a prima facie case of racial discrimination. Respectfully, I don't know if there's any support to the extent that appellant came forward with admissible evidence that there was an inference construed in favor of appellees instead of the appellant. There were simplyóit was the absence of a record that was failed to be developed by appellant, and that permeates the entire process and perspective of this appeal. And counsel indicated that the court impermissibly struck the affidavit of, I believe, Mirabelle Jones. Can you address the propriety of the court's action there? We would submit that the magistrate judge was well within his power to not consider inadmissible hearsay evidence. What made it inadmissible? Certain assertions, obviously, were hearsay, were not based on their own opinions. The Sixth Circuit has held tható And so there was no part of that affidavit that could be excised. You're saying the whole thing was just rife withó I'm not. My second point would be that the vast majority simply wasn't relevant to the issue on appeal. Their separate experiences at Singular Wireless has no bearing on whether or not appellant, in this instance, was discriminated on the account of race. And when you takeóand when this court reviews this affidavit, that becomes apparent. They're trying to draw an analogy which simply can't be drawn. They have no bearing, no personal knowledge of the decisional process which occurred here. Appellant failed to develop any evidence during discovery as to that decisional process that would contradict the properly supported evidence that was advanced by appellees. Again, this simply sort of hands are tied by the record which was developed by the appellant or the lack thereof. Does the record reflect whether Mr. Fine supervised either of these affidavits, Mr. Johnson or Ms. Jones? I don't recall offhandó Because I know that they make some assertions in their affidavits about racial animus on the part of Mr. Fine. And I guess one question is, are the affidavits clear? Maybe I'll ask Ms. Harris, in terms of the extent to which, if at all, Mr. Fine supervised Mr. Rochelle's as well as Jones and Johnson. If he did, does that have any impact onó Again, we would submit that it doesn't. There's justóthere's an absence of a record that had been developed that would contradict the fact that this was a permissible brief process that was conducted without any racial animus towards appellant. There simply was no evidence that was properly proffered that would contradict that. Wasn't Ms. Jones's information about her personal experience in Aiden-Bagshaw in reaching this sales quota admissible? And such information, therefore, would challenge the reasonableness of Fine's decision and would raise questions of pretext, at least with respect to Fine's actual motivation? It would not, Your Honor. The motivation here, which is critical from what's been developed, is the motivation of Keith Hart. Keith Hart was the area regional sales manager. Keith Hart was the one tasked with conducting the RIF process, conducting the interviews, conducting the 2004 performance evaluation. It was Mr. Hart who assessed and ranked the rankings which were developed in Appellee's brief that were assigned to all the indirect account executives. It was based on his evaluation, which Mr. Fine accepted wholeheartedly, and the record bears that, that that's how the ultimate elimination of appellant's position occurred. Again, there's no connection developed of evidence or record that would tie Mr. Fine, absent then simply accepting the recommendation of his subordinates. What was his role in the decision-making process? Didn't he make the ultimate decision? Ultimately, as the director of the North Ohio Regional Sales, he makes the decision. He could have trumped both of the gentlemen. Mr. Hart. Hart. He could have trumped Hart's decision. He could have said, well, yeah, but look at Rochelle's attainment percentages. He could have done that. You're absolutely correct. He could have. But Hart is the ultimate decision-maker, isn't he? We wouldn't dispute that. But there's nothing to suggest that the RIF process itself was conducted with discriminatory animus. There's nothing to suggest that Mr. Fine's absence for intervening, as you suggest, he could have overruled. He could have done a lot of things. There's nothing that's developed in the record that suggests that his lack of intervening was because of a racial animus towards appellant. And I'd point out, appellant mentioned during her argument council that appellant was never disciplined and relies on that, never disciplined in his career. We respectfully submit that cuts both ways. If there was this overriding racial animus towards appellant, then why wouldn't he? It stands to reason he would have an extensive record of discipline, of various conduct, which, as you said previously, Judge, that would sort of have the hallmarks, perhaps, of there being racial discrimination. There's an absence of any discipline. I want to ask you this question, and it kind of goes back to Judge Marbley's request of you to reconcile the objective with the subjective. And I want to ask, with respect to the test, the subjective component of the process, what were the employment outcomes or the criteria that this test related to? What did it measure that showed a person's probability of being able to be effective in the sales force? The three categories in the RIF interview process were driver results, creates customer loyalty, and uses sound judgment. Those are the three. After the interview process was conducted, each candidate was rated on that criteria. And, in effect, they were trying to attain at that time sort of who would be the best inter-account executive going forward, who demonstrated the best qualities to grow singular products in that particular field. And as, again, to the objective versus subjective question, a performance evaluation in and of itself, I suppose, is a subjective criteria. Yet a pellant attempts to rely on the fact that he had supposedly the highest 2003 performance evaluation. But I thought it was not just performance evaluation. It was actually, you know, hard sales numbers. That's a pretty objective criteria. For singular, he had those numbers. Again, those numbers and the accolades and all the laundry lists of items which are referenced by a pellant in his brief were simply not part of the RIF process. A pellant cannot select which criteria will or will not be conducted in the process. But don't those things go to and somehow relate directly to this whole idea of building loyalty and customer satisfaction? I wouldn't necessarily, perhaps, I mean, I wouldn't necessarily object to that position. But my point larger is simply. But that doesn't mean that we can't look behind them to determine whether there was pretext or animus. Because it's really hard when we can see someone in the sales position who achieves consistently 200 percent of quota besting all of his peers. But then they say, well, it doesn't do too well in the interview. It just doesn't make sense. I'd like to answer that question. First, these were uniform company-wide guidelines. These were not guidelines that were solely prepared for the North Ohio sales market that would be directly tailored to feathering out someone such as a pellant. These were company-wide guidelines. And second. It's not the guidelines, Mr. Coyle. It's the interpretation and implementation of the guidelines. It's the administration of the test. The guidelines on their face are objective. The questions are objective. It's how one interprets the answers and how one evaluates the candidate that, you know, sort of gets away from you. On a different record, perhaps that's a valid consideration. On this record and the absence of a record which was developed by a pellant, there's simply no basis to draw that inference. And you say that on the basis of this record, there is no question of fact that that should go to a jury. On this record, a pellant failed to meet or deduce essential evidence of an essential element of his claim. That there's a prima facie case for racial discrimination. And even if he did, as Magistrate Judge McCarthy pointed this out, he failed to establish that the legitimate nondiscriminatory reason was the basis of the pretext. You said that he failed to satisfy the prima facie case. Which component of that prima facie case did he specifically? I think we can all agree. It's the heightened fourth element, which applies in a RIF case. Showing, deducing admissible evidence that he was singled out for discharge for impermissible reasons. He failed to deduce it. He simply provided, you know, conjecture, speculation, surmise, self-serving affidavits. I don't want to repeat the brief. But again, respectfully, there's just an absence of a record to draw those inferences. Okay, Mr. Coyle. Any further questions? Thank you. Ms. Harris? Opposing counsel ended by saying that my client did not demonstrate the fourth element. But there is extensive case law, including Manzer and Chin v. Dow, that's Manzer v. Diamond-Shamrock, which says race shells may demonstrate pretext by showing singular stated reasons for terminating him either had no basis in fact, or actual reason, or was insufficient to explain that. And the court has held that a plaintiff may seek to demonstrate the employer's claim to have promoted a better qualified applicant, that to have, I'm sorry, to have promoted a better qualified applicant was pretextual by showing that he was in fact better qualified. And that's the case that we have here. Please let's not lose sight of the fact that this is a sales position. This is not an attorney. This is not a doctor. This is a person in sales. And what matters in sales is the numbers. And my client was dynamic. He was the best of the best. But, Ms. Harris, is that reflected in the record? Yes, it is, Your Honor. And let me explain how it's reflected in the record. Please. My client's affidavits, the non-refutal by the singular, Maribel, Michael Jones in singular, just like in a lot of big companies, you're able to see what everyone else is doing. The numbers are there. You go on the computer and you see what everybody else is going. And that is what they did. But you're saying those numbers are established through the testimony of peers and not through records from the company? Oh, yeah. It was the records from the company, too. They're not disputing it. They don't dispute this. And the counsel just admitted it. Well, I understand that. But, I mean, Judge Marbley asked you whether it was supported in the record, and it seems to me that if you want to point to the record, you would point to the record that establishes that most directly rather than, I guess, the collateral testimony of people who were not either supervisors or who were not necessarily in the position or did not have the responsibility of providing that documentation. In the 2003 performance reviews, which everyone was supplied, we had everyone's, my client was the number one producing because it tells you about their quotas and about their percentages. So it was established like that. So, yeah, it was established. Well, you know, Mr. Coyle argues that we don't even get to pretext, that the fourth prong of the prima facie case has not been established here, as I understand it, that Mr. Rochelle has failed to present evidence that he was singled out for an impermissible reason, as I understand his argument. And you want to address that again, maybe? Yes. And I apologize if I didn't properly address it before. Well, I'm not saying you didn't. But my addressing it was stating that the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to extend such inquiry that sheds light. In other words, he was better qualified. And that's what the case law states very specifically. And the record also shows, as we look at all the evidence that you've mentioned up until now, that Mr. Rochelle was singled out here, not given a chance to work in this reorganized company for an impermissible reason, which he argues is his race. Yes, Your Honor. And that's supported by these affidavits and other evidence. And performance reviews, previous performance reviews. It just doesn't make sense. And they're not denying it, and they've never denied it. He was the better producing. But for a racist boss, Dave Fine, who although I understand counsel has case laws to say that, you know, one can make statements and it not necessarily be racist. But my client took it as racist. They were in a restaurant, and he sees a black man with a white woman, and he has a problem with it. These are seen as racist statements. Are these things outside of the record? The things that you're talking about now, are these outside of the record? Are these stray remarks outside of the record? Oh, no. No, Your Honor. They are inside of the record. And in addition, he made racist statements about Muslims, not Muslims, Arabs who are Muslims. These are all in the record also. There was a question. You'll need to wrap up shortly because your time has expired. Thank you, Your Honor. I'll be very brief. There was a question regarding the affidavits of Maribel and Michael. If Mr. Fine was their boss, it is clear in the affidavits he was their boss. And the affidavits also show why they feel that he was racist in terms of them not being promoted, and they both actually quit because of Dave Fine and the racial animus that they felt that he was exhibiting. And there was a glass ceiling, and he would not let them advance. Okay. Anything further? No, Your Honor. Okay. Well, thank you both, Ms. Harris, Mr. Coyle, for your arguments. We appreciate them today. The case will be submitted, and you may call the next case. Thank you.